UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 3:02-CV-2266 (AVC) |
| v. | ) | |
| | ) | |
| RIDGEFIELD PROPERTIES LLC, | ) | |
| SAMUELS & ASSOCIATES | ) | |
| MANAGEMENT, LLC and THE STOP & | ) | |
| SHOP SUPERMARKET COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | April 29, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS
STOP & SHOP SUPERMARKET COMPANY, LLC'S SECOND COUNTERCLAIM
OR, ALTERNATIVELY, FOR A MORE DEFINITE STATEMENT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure Plaintiff JPMorgan

Chase Bank, N.A., formerly known as JPMorgan Chase Bank, ("Chase") submits this

Memorandum of Law in support of its Motion to Dismiss Defendant The Stop & Shop

Supermarket Company LLC's ("Stop & Shop") Second Counterclaim. Stop & Shop's Second

Counterclaim alleges that Chase's actions violated the Connecticut Unfair Trade Practices Act

("CUTPA"). Stop & Shop, however, has failed to state a claim upon which relief may be

granted because it does not plead that such actions were in the course of Chase's trade or

commerce. Indeed, they were not. As a consequence, the Second Counterclaim should be

dismissed.

Alternatively, Stop & Shop has not sufficiently pled its CUTPA claim so as to provide

Chase with adequate notice. Thus, should Chase's Motion to Dismiss be denied, pursuant to

**ORAL ARGUMENT REQUESTED**        1

Rule 12(e) of the Federal Rules of Civil Procedure Chase submits this Memorandum of Law in support of its Motion for more definite statement of Stop & Shop's Second Counterclaim.

## PRELIMINARY STATEMENT

This case arises from, among other things, a dispute between Chase and Defendant Ridgefield Properties LLC ("Ridgefield Properties") over Chase's right to use and occupy premises located at Copps Hill Plaza in Ridgefield, Connecticut that housed Chase's Ridgefield, Connecticut retail banking branch ("Demised Premises"). Stop & Shop has now entered this dispute contending that it was injured by Chase's continued use and occupancy of the Demised Premises from December 31, 2002 through May 27, 2003. Stop & Shop alleges that Chase's occupancy of the property interfered Stop & Shop's attempt to expand its own operations at another part of the Plaza and that such continued occupancy tortiously interfered with Stop & Shop's contractual relationship with Ridgefield Properties and violated CUTPA.

Though the facts will show that Stop & Shop's tortious interference claim has no merit, Stop & Shop's CUTPA claim is deficient as a matter of law. To allege a cognizable claim for a CUTPA violation, the complained of activity must have been in the course of the offending party's trade or commerce. Stop & Shop admits that Chase is a banking business. (Stop & Shop Counterclaims, ¶ 4). Stop & Shop alleges that is was injured by Chase's breach of Chase's lease with Ridgefield Properties. (Stop & Shop Counterclaims, ¶¶ 36 through 43). However, because Chase's leasing of the Demised Premises is merely incidental to Chase's trade or commerce, Chase cannot be liable under CUTPA for such activities. Thus, Stop & Shop's CUTPA claim should be dismissed as a matter of law.

Furthermore, Stop & Shop fails to articulate its CUTPA claim so as to enable Chase to respond or prepare a defense. It utterly fails to articulate how Chase's occupancy of the Demised Premises from January 1, 2003 through May 27, 2003 offends CUPTA or violates any public policy of the State of Connecticut. Thus, the Second Counterclaim is too vague or ambiguous and Chase cannot reasonably be required to frame a responsive pleading. If the Second Counterclaim is not dismissed, Stop & Shop should be ordered to make its Second Counterclaim more definite and certain.

## FACTS AS PLED BY STOP & SHOP

Chase disputes many of the allegations set forth by Stop & Shop. Nonetheless, for the purposes of this Motion, and this Motion only, Chase accepts Stop & Shops' allegations to demonstrate that its Second Counterclaim is deficient as a matter of law.

Chase and Ridgefield Properties are the successors-in-interest to parties to a lease for use and occupancy of the Demised Premises at Ridgefield Properties' Copps, Hill Plaza ("Plaza"). Until May 27, 2003, Chase operated a retail banking branch on the Demised Premises. The lease contained a duty to surrender upon the expiration of the Term, as defined in the lease. Although disputed by Chase, Stop & Shop contends that the Term expired on December 31, 2002. (Stop & Shop Counterclaims ¶¶ 4 & 5.)

Stop & Shop and Ridgefield Properties also have a lease for Stop & Shop's use and occupancy of different space at the Plaza. Furthermore, Stop & Shop and Ridgefield Properties entered into an agreement that increased the amount of retail space occupied by Stop & Shop and called for the reconfiguration of the Plaza generally. This agreement required tenants not a party to the agreement, including Chase, to relocate to accommodate Stop & Shop's expansion. Thus,

Stop & Shop drove Ridgefield Properties' course of conduct that injured Chase. (Stop & Shop Counterclaims ¶¶ 6 through 10.)

To facilitate Stop & Shop's plan, Ridgefield Properties attempted to negotiate an early termination of Chase's lease. Ridgefield Properties also offered temporary space in a trailer. Chase rejected these proposals. (Stop & Shop Counterclaims ¶¶ 15 & 16.)

Ridgefield Properties and Chase negotiated for alternative space at the Plaza. Those negotiations broke down. Ultimately, Ridgefield Properties notified Chase that it had to vacate the property on December 31, 2002. (Stop & Shop Counterclaims ¶¶ 14 - 19). Although the reasons the negotiations broke down and the date by which Chase was to vacate the property are disputed issues of fact, it should be assumed for the purposes of this Motion that Chase had a duty pursuant to the lease to vacate the property on December 31, 2002, and failed to do so in breach of the lease.

It may likewise be assumed, for purpose of this Motion, although again disputed, that Chase knew that holding over at the expiration of the lease term would jeopardize the timely completion of the expansion project and delay Stop & Shop's planned expansion. (Stop & Shop's Counterclaims ¶ 23.) Also, it must be assumed for this Motion that Chase vacated the property on May 23, 2003, almost five months after the expiration of Chase's lease. (Stop & Shop's Counterclaims ¶ 29.) Finally, it must be assumed for this Motion only that Chase's delay caused a domino effect, in which other tenants were delayed from moving thus delaying Defendant Stop & Shop's expansion, which caused Stop & Shop damage. (Stop & Shop Counterclaims ¶¶ 23, 29 & 31 - 35.

**STANDARD**

"When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff." Personal Financial Services, Inc., v. General Motors Acceptance Corp., 169 F. Supp. 2d 49, 51 (D. Conn. 2001) (citing Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F.Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232, 94 S.Ct. 1683).

**DISCUSSION**

**A.    *Stop & Shop's Second Counterclaim should be dismissed.***

Stop & Shop has failed to state a claim upon which relief can be granted because CUTPA applies only to activities within a defendant's particular trade or conduct. In this case Stop & Shop has not alleged any offending conduct related to Chase's trade of banking. Neither has Stop & Shop alleged, because it cannot, that Chase is in the business of leasing properties. Thus, Stop & Shop has failed to state a cognizable CUTPA claim as a matter of law and its Second Counterclaim should be dismissed.

Section 42-110b(a) of the General Statutes of Connecticut provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "Trade" and "commerce" are defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. §42-110a(4).

"[C]onduct merely incidental to one's business does not satisfy the definition of 'trade or commerce.'" Matthews v. Pinnacle Foods, Inc., No. Civ. 3:01-CV-2295, 2002 WL 32500872, at *2 (D. Conn. 2002) (Tab A). See Cornerstone Realty, Inc. v. Dresser Rand Co., 993 F. Supp. 107, 113 (D. Conn. 1998) (predicting that Connecticut Supreme Court would rule that "[a] CUTPA violation may not arise out of conduct that is merely incidental to the performance of one's trade or commerce."); Advest v. Carvel Corp., No. CV-98-0585401-S, 1999 WL 786357, at *2 (Conn. Super. Ct. 1999) (stating that "[m]any Connecticut cases have expressly adopted the federal District Court's analysis") (Tab B); Ridgefield Homes Realty v. Beardsley, No. CV-97-0327416-S, 2001 WL 100328, at *4 (Conn. Super. 2001) (CUTPA action not sustained when party has not alleged that any of the activities complained of were performed as part of other party's conduct of trade or commerce) (Tab C).

When seeking "[t]o impose CUTPA liability on a lessee, the key question is whether leasing property is the lessee's trade or commerce." Sealy Connecticut, Inc. v. Litton Indus., Inc., 989 F.Supp. 120, 127 (D. Conn. 1997). See Arawana Mills Co. v. United Technologies Corp., 795 F.Supp. 1238, 1252-1253 (D. Conn. 1992) ("CUTPA is more likely aimed at the activities of lessors, since 'CUTPA was designed to protect the public from unfair practices' of, for instance, landlords"). It has not been alleged, nor can it be, that leasing property is Chase's

trade or commerce.  Stop & Shop has merely alleged that Chase "was engaged in the conduct of trade and commerce" and that Chase is a bank.  But this misses the mark.

Sealy Connecticut, Inc. v. Litton Indus., Inc., 989 F.Supp. 120 (D. Conn. 1997) is on point.  In Sealy, the defendants were lessees that operated industrial facilities for manufacturing on plaintiff's property.  The plaintiff claimed that defendants violated CUTPA by contaminating the property and concealing same.  The Court granted the defendants' motion to dismiss the CUTPA claims because the plaintiff did not allege that the defendants were in the business of waste disposal.  The Court found that the alleged contamination was incidental to defendant's manufacturing business.

Similarly, in Cornerstone Realty, Inc., the plaintiff, a potential purchaser of commercial real estate, sued defendants, which were manufacturing and industrial companies, after having found contamination on the property.  Among plaintiff's claims were violations of CUTPA for misrepresenting the condition of the property.  The Court dismissed the plaintiff's CUTPA claims because the Court determined that selling a manufacturing facility was incidental to the defendants' manufacturing business.

Finally, in Matthews v. Pinnacle Foods, Inc., plaintiff entered into a contract with defendant, a company that specialized in meat processing, to procure debt financing.  Plaintiff brought a CUTPA action alleging that defendant's acts prohibited plaintiff from procuring the debt financing.  The Court dismissed the plaintiff's CUTPA claim because defendant's allegation that its primary business was meat processing was not disputed and that debt financing was merely incidental.

In this case, it is beyond dispute that Chase's primary business is banking.  As admitted in Stop & Shop's counterclaims: "Chase operated a branch bank location."  (Stop & Shop

Counterclaims ¶4). Similar to Cornerstone Realty, Inc., Sealy and Matthews, any and all issues arising from Chase's lease of retail space are clearly incidental to Chase's primary business and therefore are not in the course of Chase's "trade" or "commerce." As in Sealy, Stop & Shop's general allegation that "Chase was engaged in the conduct of trade and commerce at all times relevant to this Complaint," (Stop & Shop's Counterclaims, ¶45), does not demonstrate that Chase was in the primary business of leasing property. As in Matthews, none of Stop & Shop's claims relate to Chase's primary business. Neither does Stop & Shop dispute that Chase's primary business is banking. Thus, Stop & Shop's failure to plead the requisite elements of a CUTPA claim, and the impossibility of it rectifying its deficiencies in good faith, necessitates dismissal for failure to state a claim upon which relief may be granted.

**B.**     ***Alternatively, Stop & Shop's Second Counterclaim is too Vague or Ambiguous for Chase to Respond.***

Stop & Shop has merely alleged broad and generalized allegations and has failed to provide notice as to what conduct of Chase violated CUTPA and what aspect of CUTPA was offended. Without such information, Chase cannot adequately respond and defend against Stop & Shop's Second Counterclaim.

Pursuant to Rule 12(e) of the Federal Rules of Civil Procedure:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that  party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired . . . .

Notwithstanding the Federal Rules' liberal pleading standard and general disfavor of the rule,

Rule 12(e) motions are granted when the pleadings are unintelligible thus preventing a party

from responding.  See Wallet v. Anderson, 198 F.R.D. 20, 24 (D. Conn. 2000); Caldor, Inc. v.

Laser Computers, Inc., No. Civ. 3:93-695, 1993 WL 298971, at *1 (D. Conn. 1993) (Tab D).

Besides general factual allegations, Stop & Shop's Second Counterclaim for violation of

CUTPA simply states:

> 45.    Chase was engaged in the conduct of trade and commerce
> at all times relevant to this Complaint.
> 46.    Chase's conduct constitutes unfair and deceptive acts or
> practices in the conduct of trade or commerce in violation of
> C.G.S.A. §42-220b.

(Stop & Shop Counterclaims, ¶¶ 45 & 46).  Thus, Stop & Shop's Second Counterclaim does not

articulate a claim for violation of CUTPA other than to generally allege that Chase violated it.

Stop & Shop failed to set forth specific and necessary information regarding the CUTPA claim,

including:

1.    how Chase's conduct relates to its trade and commerce;

2.    what conduct, including the time, place and content, as well as the representatives of Chase that engaged in such conduct, that constitutes unfair deceptive acts or practices and how same is related to Plaintiff Chase's trade and commerce;

3.    whether such acts or practices were oral or written and how they were directed toward Stop & Shop;

4.    the business transaction(s) or relationship, including details such as whether such transaction(s) or relationship was written or oral, isolated or

recurring, that Stop & Shop had with Chase in which Defendant Stop & Shop bases its CUTPA claims;

5.    and what public policies, if any, Chase's conduct offends.

This information is necessary for Chase to frame an answer. Without a more definite statement, Chase is unable to review its records, interview the proper employees or executives, or evaluate settlement possibilities.

## CONCLUSION

Stop & Shop has not stated a claim for violation of CUTPA. Specifically, Stop & Shop fails to allege and cannot allege that Chase's leasing activities are its primary business. Instead, by its own pleadings Stop & Shop demonstrates conclusively that Chase's primary business is banking and that none of its claims relate to Chase's banking services. At best, Chase's leasing issues are incidental to its primary business. As a consequence, Stop & Shop has failed to state a claim upon which relief may be granted and its Second Counterclaim should be dismissed.

Alternatively, Defendant Stop & Shop's pleading of its Second Counterclaim for violation of CUTPA is too vague or ambiguous for Chase to reasonably be required to frame a response or a defense. Specifically, Stop & Shop simply alleges in general that Chase was engaged in trade or commerce and that Chase violated CUTPA. Because Stop & Shop's allegation is unintelligible, the Court should order that Defendant Stop & Shop make its Second Counterclaim for violation of CUTPA more definite and certain.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF,
JPMORGAN CHASE BANK, N.A. FORMERLY
KNOWN AS JPMORGAN CHASE BANK
BY MCCARTER & ENGLISH, LLP
ITS ATTORNEYS


By: _____
     Timothy S. Fisher (CT 05370)
     Jason C. Welch (CT 23418)
     McCarter & English, LLP
     City Place I, 36th Floor
     Hartford, CT 06103-3495
     860.275.6775
     tfisher@mccarter.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing MEMORANDUM OF LAW has been sent via regular mail, postage prepaid this 29th day of April, 2005.

Jeffrey J. Mirman, Esq.
Levy & Droney PC
74 Batterson Park Road
P.O. Box 887
Farmington, CT 06034-0887

Lewis Wise, Esq.
Rogin Nassau
CityPlace I
185 Asylum Street
Hartford, CT  06103

John C. LaLiberte, Esq.
Anthony L. DeProspo, Esq.
Sherin and Lodgen LLP
101 Federal Street
Boston, MA  02110


_____
Jason C. Welch

# EXHIBIT A



Not Reported in F.Supp.2d
2002 WL 32500872 (D.Conn.)
(Cite as: 2002 WL 32500872 (D.Conn.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Robert V. MATTHEWS, Plaintiff,
v.
PINNACLE FOODS, INC., Defendant.
No. Civ. 301CV2295PCD.

Oct. 2, 2002.

David Heinlein, Elizabeth J. Robbin, Rogin, Nassau, Caplan, Lassman & Hirtle, Hartford, CT, for Plaintiff.

Alexander G. Filotto, John B. Nolan, Steven M. Greenspan, Day, Berry & Howard, Hartford, CT, for Defendant.

*RULING ON MOTION TO DISMISS*

DORSEY, J.

*1 Defendant moves to dismiss Count Three of the complaint alleging a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42-110a *et seq.* For the reasons set forth herein, the motion is granted.

I. BACKGROUND

On June 29, 2000, plaintiff entered into a loan agreement with defendant, a company specializing in meat processing, by which plaintiff agreed to loan defendant $300,000. Defendant executed a promissory note in conjunction with the loan agreement.

On November 22, 2000, plaintiff entered into a second agreement which modified the terms of the loan agreement. Under the second agreement, plaintiff became financial advisor to defendant and agreed to procure debt financing for defendant of $9.5 million. Defendant agreed to deliver 1.1 million shares of defendant's common stock to plaintiff not later than February 1, 2001. The agreement further provided that plaintiff would receive an additional 1.1 million shares of defendant's common stock upon

satisfactorily procuring the debt financing. All shares of common stock were protected by an anti-dilution provision. The second agreement further provided that either party could terminate the agreement if debt financing were not procured by March 31, 2001.

Plaintiff was unable to perform under the agreement due to defendant's failure to cooperate with plaintiff, failure to provide timely and accurate information to plaintiff and failure to inform plaintiff of financial conditions which hindered plaintiff's efforts to obtain financing. As a consequence, plaintiff was unable to obtain debt financing by the deadline. On April 6, 2001, defendant terminated the agreement having delivered none of its shares of common stock to plaintiff.

On or about May 31, 2001, defendant entered into a stock purchase agreement with Smithfield Foods, Inc. ("Smithfield"), by which defendant agreed to sell approximately 13 million shares of its common stock. Defendant began negotiating the purchase agreement in February 2001. Defendant disclosed the purchase agreement in its proxy statement in addition to its dispute with plaintiff as to compliance with their agreements. The proxy statement further provided that Smithfield would be entitled to purchase a number of shares equal to the number purchased by plaintiff at $0.01 per share rather than the normal $0.45 per share. The statement did not indicate that, in accordance with the anti-dilution provision in the original loan agreement, plaintiff would be compensated for the share price disparity.

II. DISCUSSION

Defendant argues that plaintiff's CUTPA claim must be dismissed for failure to allege conduct that constitutes "trade or commerce" and for failure to allege more than breach of contract.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is properly granted when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.2001) (internal quotation marks omitted). A motion to dismiss must be decided on the facts as alleged in the complaint. *Merritt v. Shuttle, Inc.,* 245 F.3d 182, 186 (2d Cir.2001). All allegations are assumed to be true and are considered in a light most

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 32500872 (D.Conn.)
**(Cite as: 2002 WL 32500872 (D.Conn.))**

favorable to the non-movant. *Manning v. Util. Mut. Ins. Co.,* 254 F.3d 387, 390 n. 1 (2d Cir.2001).

  *2 Conn. Gen.Stat. § 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "Trade" and "commerce" are defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen.Stat. § 42-110a(4). It has been consistently held that conduct merely incidental to one's business does not satisfy the definition of "trade or commerce." *See Cornerstone Realty, Inc. v. Dresser Rand Co.,* 993 F.Supp. 107, 113 (D.Conn.1998); *Sealy Conn., Inc. v. Litton Indus.,* 989 F.Supp. 120, 127 (D.Conn.1997); *Brandewiede v. Emery Worldwide,* 890 F.Supp. 79, 81 (1994); *Arawana Mills Co. v. United Techs. Corp.,* 795 F.Supp. 1238, 1253 (D.Conn.1992). Defendant is alleged to be in the business of meat processing, not the business of debt financing. Plaintiff does not dispute the nature of defendant's business, nor does he provide a persuasive reason for deviating from the holdings of other courts in this district on the precise issue here presented. As such, plaintiff's claim does not implicate trade or commerce for purposes of CUTPA.

III. CONCLUSION

  Defendant's motion to dismiss (Doc. No. 11) is granted Count 3 is hereby dismissed.

  SO ORDERED.

  2002 WL 32500872 (D.Conn.)

  **Motions, Pleadings and Filings (Back to top)**

  . 2001 WL 34624829 (Trial Pleading) Complaint (Dec. 07, 2001)

  . 3:01CV02295 (Docket) (Dec. 07, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in A.2d
1999 WL 786357 (Conn.Super.), 25 Conn. L. Rptr. 518
**(Cite as: 1999 WL 786357 (Conn.Super.))**

**H**
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.
ADVEST, INC.,
v.
CARVEL CORPORATION.
No. CV 98-0585401S.

Sept. 21, 1999.

MEMORANDUM OF DECISION

PECK.

**\*1** The plaintiff, Advest, Inc., brings this lawsuit against the defendant Carvel Corporation in six counts essentially alleging breach of contract and violation of Connecticut's Unfair Trade Practices Act (CUTPA), General Statutes § § 42-110, et seq. Carvel has filed a motion to strike Advest's CUTPA claim and an apparent breach of contract claim which comprise counts three and six of the amended complaint. In accordance with the allegations set forth in the amended complaint, Advest's claims arise out of a written agreement between the parties wherein Carvel agreed to engage Advest as its exclusive agent for the purpose of structuring and placing all debt issued by Carvel for a period of two years. (First Count, 3.) In return, Carvel agreed to pay Advest an investment banking fee plus reasonable expenses based on the percentage of the debt placed by Advest. (First Count, 4-6.) Although Carvel consummated $27 million ($27,000,000) dollars in financing with Chase Bank whereby Carvel issued notes and/or similar securities of the kind contemplated by Advest and Carvel under their agreement, Carvel did not pay Advest its contractual investment banking fee. (First Count, 10-12.)

I.

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted ..." *Peter-Michael, Inc. v. Sea Shell Associates,* 244 Conn. 269, 270, 709 A.2d 558 (1998); see *Emerick v. Kuhn,* 52 Conn.App. 724 (1999). "In ruling on a motion to strike, the court is limited to the facts alleged in the complaint," *Faulkner v. United*

*Technologies Corporation,* 240 Conn. 576, 693 A.2d 293 (1997), "must take as true the facts alleged ... and must construe the complaint in the manner most favorable to sustaining its legal sufficiency ... If facts provable in the complaint would support a cause of action, the motion to strike must be denied." *Peter-Michael, Inc. v. Sea Shell Associates, supra,* 244 Conn. 270.

II

General Statutes § 42-110b(a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b(a). "Trade" and "commerce" are defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110(4).

Although "[t]here is a split of authority in the Superior Court over whether or not CUTPA requires that there be more than one allegation of wrongdoing ... the majority of superior court decisions ... have held that a litigant does not need to allege more than a single act of misconduct in order to bring an action under CUTPA ..." (Citations omitted; internal quotation marks omitted.) *Underwriters Support Group, Inc. v. Fortis,* Superior Court, judicial district of New Britain at New Britain, Docket No. 487732, 24 CONN. L. RPTR. 488 (May 7, 1999) (Robinson, J.); see *Messler v. Barnes Group,* Superior Court, judicial district of Hartford at Hartford, Docket No. 560004, 24 CONN. L. RPTR. 107 (February 1, 1999) (Teller, J.) (motion for summary judgment denied because "defendant has not established that a single transaction cannot form the basis for a CUTPA action as a matter of law"). "[U]sually, [however,] when CUTPA is held to apply to a single transaction the defendant is an entity or an individual engaged in a business activity which is at the heart of the complaint and the alleged violation ... The split in authority is focused on whether CUTPA applies to a single private transaction by one who is not in the business of making such transactions ..." *Jokl v. Watt,* Superior Court, judicial district of New Haven at New Haven, Docket No. 372000 (February 28, 1996) (Gray, J.) "[W]hether [a] plaintiff's complaint actually alleges a single violation or whether it is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 2
1999 WL 786357 (Conn.Super.), 25 Conn. L. Rptr. 518
**(Cite as: 1999 WL 786357 (Conn.Super.))**

based on numerous violations is of no import ... [for purposes of finding a CUTPA violation]." *Underwriters Support Group, Inc. v. Fortis, supra,* Superior Court, Docket No. 487732, 24 CONN. L. RPTR. 488.

*\*2* "Cases decided by the United States District Court for the District of Connecticut have held that where the actions of the defendant are incidental to its primary business, it cannot be liable under CUTPA." *Feen v. Benefit Plan Administrators,* Superior Court, judicial district of New Haven at New Haven, Docket No. 406726 (January 13, 1999) (Devlin, J.) (finding that alleged wrongful activity was "incidental to [the defendant's] primary business activity ... and that CUTPA, therefore, is not applicable"); see <u>*Cornerstone Realty, Inc. v. Dresser Rand Co.,* 993 F.Supp. 107, 113 (D.Conn.1998)</u> ("a CUTPA violation may not arise out of conduct that is merely incidental to the performance of one's trade or commerce"); <u>*Sealy Connecticut, Inc. v. Litton Industries Inc.,* 989 F.Supp. 120, 127 (D.Conn.1997)</u> ("CUTPA does not encompass [activity] incident to a defendant's [primary business] operations"); <u>*Brandewiede v. Emery Worldwide,* 890 F.Supp. 79, 81 (1994)</u> ("there is no viable claim under CUTPA when the practice complained of is incidental to the true trade or business conducted"); <u>*Arawana Mills Co. v. United Technologies Corp.,* 795 F.Supp. 1238, 1253 (D.Conn.1992)</u> (a defendant's actions which are "incidental to the conduct of its true business" do not fall within the meaning of "trade or commerce" for purposes of CUTPA).

In addition to *Feen v. Benefit Plan Administrators, supra,* Superior Court, Docket No. 406726, many Connecticut cases have expressly adopted the federal District Court's analysis. See, e.g., *Abely Waste Oil v. Ravenswood Development Corp.,* Superior Court, judicial district of New Haven at New Haven, Docket No. 369487, 15 CONN. L. RPTR. 562 (September 15, 1995) (Hartmere, J.) (defendant's conduct which is "merely incidental to the primary trade of the defendant" does not give rise to a viable CUTPA claim); *Barnes v. General Electric Co.,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 529354, 14 CONN. L. RPTR. 455 (July 25, 1995) (Hennessey, J.) ("[T]he plaintiffs' allegations of the defendants' [actions] ... are merely incidental to the primary trade or commerce of the defendants. Therefore, a CUTPA claim based on such alleged conduct is not viable against the defendants"); *Mantie v. The Inn at Manchester, Inc.,* Superior Court, judicial district of Tolland at Rockville,

Docket No. 058009, 18 CONN. L. RPTR. 438 (January 9, 1997) (Hammer, J) ("the plaintiff cannot claim that the conduct complained of ... was directly related to [the defendant's] principal business activity rather than being merely incidental to it, or ... totally unrelated to its true business").

*\*3* With respect to single acts of misconduct which occur in the course of a defendant's primary business, additional Connecticut courts have come to a similar conclusion as the federal District Court. "Where ... the single act complained of is alleged to have been committed by a business person in the course of a transaction which was a part of his or her business ... such an act may form a basis of a CUTPA claim ..." (Citations omitted.) *L. Suzio Construction Co. v. Citizen's Bank of Connecticut,* Superior Court, judicial district of New Haven at New Haven, Docket No. 398079 (August 7, 1998) (Silbert, J.); see *Glaser Realty Associates v. Joshua Morris Publishing, Inc.,* Superior Court, judicial district of Danbury, Docket No. 322785 (January 15, 1997) (Moraghan, J) ("[u]sually when CUTPA is held to apply to a single transaction, the defendant is an entity or an individual engaged in a business activity which is at the heart of the complaint and alleged violation"); *Nathan v. Marcinkeviciene,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 560919 (March 7, 1997) (Hennessey, J) (plaintiff's CUTPA claim cannot stand because plaintiff failed to allege that action complained of occurred as a part of the defendant's primary business); *Heyman Associates # 1 v. United Technologies Corp.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 289456, 8 CONN. L. RPTR. 360 (February 16, 1993) (Stodolink, J) (plaintiffs failed to allege a legally sufficient CUTPA claim where "the alleged unlawful and deceptive acts [of mishandling hazardous substances] were not done in the conduct of the defendant's trade or commerce" as the defendant was "not in the trade or business of being a lessee").

The case of *Mayer-Wittman Joint Ventures, Inc. v. Gunther International Ltd.,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 134790, 12 CONN. L. RPTR. 532 (October 21, 1994) (Lewis, J.), is of particular interest. The relevant facts in *Mayer-Wittman* appear to be quite similar to those in the present case. In *Mayer-Wittman,* the defendant hired the plaintiff "to assist it in ... recapitalizing the corporation. According to the plaintiff, the parties reached an agreement, which was reduced to writing, regarding the plaintiff's compensation. The plaintiff [sued] the defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1999 WL 786357 (Conn.Super.), 25 Conn. L. Rptr. 518
(Cite as: 1999 WL 786357 (Conn.Super.))

because [the defendant] ... allegedly failed to honor the terms of the agreement." *Id.* The court applied the following principle to its analysis: "[T]he central issue in determining whether CUTPA should apply is whether 'the party *against* whom [the CUTPA claim] is made is in the business of entering into transactions of the type that is at issue.' *Larson et Sakiba v. C & C Package Store,* 10 CONN. L. RPTR. 441, 9 CSCR 62 (December 13, 1993) (Corradino, J.)." (Emphasis added.) *Id.* The *Mayer-Wittman* court ruled that, "[a]s the complaint is written, while the plaintiff appears to be in the business of providing the services at issue, [the defendant] is not in the business of reorganizing and restructuring its debt. Accordingly, CUTPA does not apply to the transaction and therefore [the defendant's] motion to strike [the CUTPA claim] is granted." *Id.*

*4 Advest directs the Court's attention to a split of authority concerning single acts, and cites to a line of cases which have held that such acts violate CUTPA. Although the cases cited by Advest may be authority for the proposition that CUTPA does apply to single acts, they are distinguishable. The alleged acts in those cases typically center around the sale, rental or lease of real estate, or sale of a business acts which more persuasively fall within the definition of trade or commerce under CUTPA. The split of authority over whether a single act violates CUTPA is most often found in cases which involve an isolated real estate transaction, or sale of business, by a private individual while the instant case involves the alleged breach of a debt restructuring agreement. [FN1]

FN1. See *Rancourt v. Janosko,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 339940, 24 CONN. L. RPTR. 73 (February 4, 1999) (Skolnick, J.) ("an isolated private sale of real estate by one not in the business of doing so, is not encompassed within the 'trade or commerce' language of the CUTPA statute"); *Chiangi v. Rust International, Inc.,* Superior Court, judicial district of New London at New London, Docket No. 544547, 23 CONN. L. RPTR. 571 (January 5, 1999) (Mihalakos, J.) ("[t]he sale of a business by one not engaged in the business of selling is not sufficient to state a cause of action under CUTPA"); *Pfeffer v. Fontana,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 340872 (December 30, 1997) (Skolnick, J.) ("a one time sale of a private residence by [private individuals], who are not engaged in the real estate trade,

is not covered by CUTPA"); *Jokl v. Watt, supra,* Superior Court, Docket No. 3 72000 ("[t]he court adopts the reasoning of those courts which have declined to hold CUTPA applicable to a single private transaction by a person not employed in the business of making the transaction in question"); *Doty v. Silver,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 293192 (February 24, 1995) (Hauser, J.) ("an isolated private sale of real estate by one not in the business of doing so, is not encompassed within the 'trade or commerce' language of the CUTPA statute").

But see *Cizynski v. Tarantino,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 147496, 17 CONN. L. RPTR. 191 (July 16, 1996) (Hickey, J.) (motion to strike CUTPA claim denied in case involving sale of a business by one not in the business of selling businesses); see also *Holeva v. M & Z Associates,* Superior Court, judicial district of New Haven at New Haven, Housing Session, Docket No. 098403 (November 9, 1998) (Levin, J.) (CUTPA applies to "business persons engaged in transactions involving business or commercial real estate," even if it is a "single transaction involving real estate by one not in the business of such a transaction").

More importantly, Advest fails to distinguish between a single act which occurs during the course of a defendant's primary business, and a single private transaction by one who is not in the business of making such transactions. In fact, the cases cited to by Advest provide support for the primary business analysis because the single acts involved therein occurred within the course of the defendant's primary business. [FN2] The court finds that the line of state and federal cases which focuses on whether the alleged acts occurred as a part of a defendant's primary business is most applicable to the present action. Thus, Advest's argument in its opposition to Carvel's motion to strike is misguided. The issue in this case is not whether CUTPA applies to single acts, rather, the issue is whether the alleged single act in this case constitutes "trade or commerce" within the meaning of CUTPA.

FN2. The facts found in the additional cases involving single acts cited to by Advest, in its memorandum in opposition to Carvel's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
1999 WL 786357 (Conn.Super.), 25 Conn. L. Rptr. 518
**(Cite as: 1999 WL 786357 (Conn.Super.))**

support for the primary business analysis: *Larsen Chelsey Realty v. Larsen,* 232 Conn. 480, 656 A.2d 1009 (1995) (CUTPA implicated by defendant's false statements made to plaintiffs clients, that plaintiff, a competitor, was going out of business); *Lovick v. Nigro,* Superior Court, judicial district of Hartford-New at Hartford, Docket No. 542473 (February 21, 1997) (Lager, J) (motion to strike CUTPA claim denied where landlord violated statutes governing leasing premises in which there is potential for hazardous exposure to lead paint); *Salem v. Krygowski,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 081367, 14 CONN. L. RPTR. 222 (April 5, 1995) (DiPentima, J) (motion to strike CUTPA claim denied where plaintiff alleged landlord failed to maintain premises and left premises in condition which violated applicable building and health codes); *Horowitz v. Cottle,* Superior Court, judicial district of New Haven, Housing Session, Docket No. 044378 (July 9, 1992) (Vertefeuille, J) (motion to strike CUTPA claim denied where it was alleged that landlord failed to satisfactorily maintain facilities and common area); *Oat v. Whittle,* Superior Court, judicial district of New London at Norwich, Docket No. 093417, 3 CONN. L. RPTR. 183 (January 22, 1991) (Austin, J) (motion to strike CUTPA claim denied where claim involved single act of misrepresentation by real estate agent in real estate transaction).

The present action is even further removed from CUTPA application than both the real estate transaction/sale of business and "primary business" cases. In addition to the fact that this action is based upon a contract which did not involve a real estate transaction or a sale of a business, and the contract was not entered into as a part of Carvel's primary business, [FN3] it is significant that Carvel was to be the recipient of services under the contract, not the offeror. See General Statutes § 42-110a(4). Advest has failed to allege that Carvel is in the debt restructuring business, or that Carvel's actions in accepting Advest's services constituted "trade or commerce" on the part of Carvel, within the meaning of CUTPA. Advest has not alleged that Carvel's alleged acts constitute the advertising, sale or rent or lease, the offering for sale or rent or lease, or distribution of, any "service," "article," "property" or

"commodity." Rather, the facts as alleged in the complaint appear to establish that Carvel was the recipient of services, not the provider.

> FN3. Advest has failed to allege any facts which would allow the Court to determine what exactly is Carvel's primary business. Nonetheless, the Court will take judicial notice of the fact that Carvel's primary line of business is selling ice cream and ice cream products. This fact merely supports a finding that Carvel's alleged acts did not violate CUTPA, as they were incidental to the conduct of Carvel's primary trade or business.

Advest has failed to allege sufficient facts to support its CUTPA claim. Accordingly, Carvel's motion to strike count three of the complaint is granted.

III.

Count six of the complaint, when construed most favorably to Advest, is not viewed as an unjust enrichment cause of action "in disguise," rather, it is viewed as a possible breach of contract claim. [FN4] As such, the elements of count six should have been pleaded in count one of Advest's complaint, which count sets forth Advest's general breach of contract claim in detail. At best, count six is duplicative of count one.

> FN4. An unjust enrichment claim was stricken from the original complaint.

*5 Accordingly, Carvel's motion to strike counts three and six of the complaint is granted.

1999 WL 786357 (Conn.Super.), 25 Conn. L. Rptr. 518

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in A.2d                                                                                         Page 1
2001 WL 100328 (Conn.Super.)
**(Cite as: 2001 WL 100328 (Conn.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
RIDGEFIELD HOMES REALTY,
v.
Marylynn BEARDSLEY, et al.
**No. CV970327416S.**

Jan. 12, 2001.

MEMORANDUM OF DECISION

ADAMS.

*1 The plaintiff, Ridgefield Homes Realty (Realty), a licensed real estate broker, brought this action to recover a real estate commission allegedly earned in connection with the sale of residential real property located at One Oscaleta Road in Ridgefield, Connecticut. The defendants are Marylynn Beardsley and Constance Green-Geyer, daughter and mother respectively, and owners of the subject residence. Defendant Beverly Tuma purportedly purchased the property from Beardsley and Geyer and shortly thereafter sold it to defendant, Linda Villano.

In the first count of the revised complaint, it is alleged that Beardsley and Geyer signed a nonexclusive listing contract with Realty agreeing on a commission of 4 percent of any agreed sale price. It is further alleged that Realty showed the Beardsley-Geyer house to Villano and that Villano used a straw person, Tuma, to purchase the home for Villano to avoid the commission and that Beardsley and Geyer participated in this effort to avoid the commission. The second count reiterates the same allegations.

The third count, styled "quantum merit" (sic), alleges that Realty expended time and money showing the house and none of the defendants has paid for the value of these services. The fourth count alleges a conspiracy among all the defendants to avoid payment of a sales commission. In the fifth count, the plaintiff alleges that the above conspiracy was "dishonest, deceitful ... immoral," etc. and was in violation of the Connecticut Unfair Trade Practices Act (CUTPA).

Beardsley appeared pro se, generally denying the allegations, and alleging a special defense that her signature to the listing agreement was forged. Geyer, Beardsley's mother, generally denied the allegations. Tuma did not appear or plead in the action, and Villano denied the allegations.

The case has not been well pleaded. Each count in the complaint contains repetitive and unnecessary allegations. For instance, the first two counts are identical in all respects. Viewed very charitably, they might be construed as attempting to allege a breach of contract and tortious interference with contract, except that: (1) each count is directed at all defendants when only Beardsley and Geyer were contracting parties, and Tuma and Villano the only potential interferers, and (2) no words connoting breach or interference are contained therein. Furthermore, the complaint repeatedly refers generally to "defendants" when further identification is clearly called for. On the other side, Geyer's answer satisfies itself (but no one else) by simply denying whole counts rather than individual paragraphs and allegations.

The matter was tried before the court on November 7, 2000. Geyer, according to counsel, chose not to appear; her counsel was present but expressly declined to offer evidence or to examine witnesses. Beardsley was alleged to be possibly mentally retarded, although no evidence of this was offered. In any event, she did not appear, and as noted above, Tuma was in default.

Toni Walsh testified for the plaintiff. Walsh is a licensed broker who obtained the signed, open and nonexclusive listing agreement. She was present when Geyer executed the document and has no recollection of Beardsley signing it. In open court, Geyer's attorney stated that Geyer admitted forging Beardsley's signature, and indeed what appears to be Geyer's initials appear below the purported Beardsley signature.

*2 The listing agreement is, in part, unintelligible. At the outset, it clearly states that if Realty negotiates a sale of the One Oscaleta premises at a selling price of $303,995, it will be owed a commission of 4 percent of that price by the sellers. The next few words read as follows:

Not Reported in A.2d
Page 2
2001 WL 100328 (Conn.Super.)
(Cite as: 2001 WL 100328 (Conn.Super.))

2) Should I/we sell or lease to anyone who saw the property through you or any of your representatives during the term of this agreement, or within 12 months from this agreement ends.

One might infer that the above non-sentence may have intended the payment of a commission under the circumstances described, but that intent is clearly not expressed. Harris testified that the 4 percent commission would be owing on any sale price, not just $303,995, but that intent is not clearly stated either. Further along, the agreement states:

5) This agreement as enforceable only between owner [identified as Geyer/Beardsley] and Tomislav Podreka and or Linda Villano,

Obviously, neither Podreka nor Villano are parties to the agreement, so the above provision makes no sense as written, although it appears that perhaps the intent was to apply the commission only to a sale to one or the other of them.

Harris testified that she showed the One Oscaleta residence to Podreka and Villano, who were then husband and wife, at least three times beginning on April 6, 1996. Eventually, Podreka and Villano made a bid of $215,000 for the property and signed a binder agreement dated July 17, 1996. Harris was very reluctant to convey the bid to the owners, describing it as "really low," and told Podreka and Villano that bare building lots in Ridgefield were selling for more. Villano testified that Harris was rude and insulting about the low offer. In any event, the bid was conveyed to Geyer, who was described by Harris as upset, and who countered by lowering the sale price to either $285,000 or $297,000 (Harris testified to the lower figure, Villano to the higher).

According to Villano, she and her husband were willing, even eager, to continue negotiations; however, the owner of Realty, Vi Szentkuti, called them the following Monday to say Realty was closing the books on the negotiations with Geyer and would return their binder check. Szentkuti told either Podreka or Villano that Realty was terminating the negotiations between them and Geyer, and that Realty anticipated receiving an exclusive listing for the One Oscaleta Road property and expected it to sell at or close to the listed price. At that time, Podreka told Szentkuti of their unhappiness with Harris' attitude. According to Harris, she received a note from Szentkuti to the effect that Podreka and Villano were very unhappy with her and did not wish to do any more business through her.

Substantive contact between Podreka and Villano on one hand and Realty and Harris on the other ended

around July 23, 1996. Subsequently, according to Villano, she and her husband received information from another broker that One Oscaleta Road was not listed with any broker, and they were advised that they were free to contact Geyer. Apparently, that contact occurred in late August. Negotiations took place over a period of time, and a sale price of $260,000 agreed on.

*3 According to Villano, when she was preparing to sign a contract with Geyer, her attorney advised her the property was in the name of Beverly Tuma of Thornwood, New York. The record contains a copy of a deed for One Oscaleta Road from Geyer and Beardsley to Tuma, recorded October 15, 1996. The deed reflects a sale price of $260,000, and there is evidence that Tuma assumed a $245,000 mortgage on the property. Villano purchased the property from Tuma for $260,000, and a deed to that effect was recorded on November 21, 1996.

Harris' recollection is somewhat different. She recollects that the time period between the end of her relationship with Podreka and Villano and when she learned of the sale to Tuma was about two and a half weeks. Additionally, she immediately concluded that there was a conspiracy to defraud her of a commission *even before* learning of the sale from Tuma to Villano.

Villano testified that during the time period she and her husband were negotiating with Geyer, they were in regular contact with an individual described as a financial advisor to Geyer, a George Galgano. It was Galgano who took over the major negotiation role for Geyer. Galgano also witnessed the deed from Tuma to Villano.

As noted above, defendants Tuma, Geyer and Beardsley were not present at the trial to testify, and neither was Galgano. [FN1]

FN1. There is some speculation recorded in a pretrial conference memorandum in the court's file that one Delgano was a friend of Tuma. Realty moved to have George Delgano added as a party defendant. This belated motion came before the court on the morning of the trial of this case and was denied on the basis that it would clearly and significantly delay the trial which had already been postponed once. It is possible that Delgano and Galgano are the same person. Of course, plaintiff could have obtained Delgano's (or Galgano's) testimony

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 100328 (Conn.Super.)
**(Cite as: 2001 WL 100328 (Conn.Super.))**

through discovery.

### DISCUSSION

Unfortunately, in adjudicating this case, the court is faced with the dual difficulties of confusing pleadings and very incomplete, if not a total lack of, evidence on certain key issues.

There are some facts such as the timing of the sales of the property to Tuma and Villano and the identical sales prices from which an inference might possibly be drawn that there was a conspiracy to avoid payment of a commission on the sale of One Oscaleta Road. Additional evidence might have put meat on the bones of this theory, but such was not forthcoming. Moreover, the testimony of Harris that a conspiracy existed is unpersuasive because (1) she had no direct knowledge, and (2) her conclusion preceded any state of facts which could support it. She based her conclusion on "facts" and impressions which are not supportive. For instance, two reasons given for the conclusion were that Podreka and Villano "dropped out of the picture" and did not return Harris' telephone calls. But these are not surprising consequences of the communications they had with Szentkuti to the effect that Realty was terminating the negotiations between them and Geyer. Harris also pointed to a complaint made by Villano to state authorities about her conduct. However, the complaint appears to be more of a reaction to the institution of Realty's lawsuit against Villano. Therefore, the court concludes that there is not sufficient credible evidence upon which to find a conspiracy existed.

The court also concludes that plaintiff's contract claim must fail because: (1) the contract as written is unenforceable against Geyer, and (2) Realty terminated the contract. As pointed out above, the contract language does not specifically obligate Geyer to pay a commission in circumstances where Realty did not negotiate the actual sale transaction. Additionally, crediting the testimony of Villano, the court finds that Realty terminated the negotiations with Podreka and Villano when the evidence indicates that both they and Geyer wished to continue to negotiate. In effect, Realty, apparently believing that the Podreka-Villano bid was too low and not competitive, took that couple off the table as potential buyers.

**\*4** The plaintiff's cause of action under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., cannot be sustained. The plaintiff has not alleged that any of the activities complained of were performed as part of any defendant's conduct of trade or commerce. There was no evidence presented that any party, except the plaintiff, was in the business of selling, buying or negotiating about, real estate. *See* review of state and federal cases examining this issue in *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F.Supp. 107, 111-13 (D.Conn.1998).

The court turns now to the claims for quantum meruit asserted by plaintiff against all defendants. A quantum meruit claim seeks a form of restitution and is commonly employed where one seeks payment for work or services performed. A plaintiff may employ the theory only where no express contract exists covering the subject matter. *Burns v. Koellmer,* 11 Conn.App. 375, 384, 527 A.2d 1210 (1987). Therefore, plaintiff may not recover on that claim.

The court construes the second count of the complaint as a claim of unjust enrichment, another form of restitution. The fact that Realty had an express contract that cannot recover on it does not preclude recovery on the theory of unjust enrichment. *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 649 A.2d 518 (1994). The essential underpinning of an unjust enrichment claim is that under a given fact situation, it would be contrary to equity and good conscience for someone to retain a benefit provided by another through services rendered without some recompense. *Id.* In this case, there were no services performed or benefit provided by Realty to either Tuma or Villano. Services were provided Beardsley and Geyer to the extent that Realty introduced an eventual buyer, Villano, to the One Oscaleta Road property. Under the circumstances, there does not appear to have been any knowing benefit accepted by Beardsley. The court finds, however, that a benefit was knowingly accepted by Geyer and that it would be inequitable not to pay for that benefit. Since the services provided by Realty terminated well before any sale took place and before the parties were even very close in price, the court determines that the benefit to Geyer was in the amount of $4500.

### CONCLUSION

**\*5** Realty is awarded a judgment of $4500 against Geyer. Realty shall take nothing against the remaining defendants.

2001 WL 100328 (Conn.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.                                                   Page 1
1993 WL 298971 (D.Conn.)
**(Cite as: 1993 WL 298971 (D.Conn.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.
CALDOR, INC.
v.
LASER COMPUTERS, INC.
**Civ. A. No. 3:93-695(JAC).**

June 29, 1993.

Eliot B. Gersten, Hartford, CT, Martin E. Karlinsky, New York City, for plaintiff.

John C. Heffernan, Hartford, CT, for defendant.

RULING ON MOTION FOR A **MORE DEFINITE STATEMENT**

JOSÉ A. CABRANES, Chief Judge:

*1 Pending before the court is the Motion for a **More Definite Statement** (filed May 17, 1993) of defendant Laser Computers, Inc. ("Laser"). Plaintiff Caldor, Inc. ("Caldor") has alleged in its Complaint (filed April 1, 1993) (the "Complaint") five claims for relief against Laser in connection to the latter's alleged violation of an agreement for the sale of personal computers and associated peripheral equipment. Laser contends here that plaintiff Caldor failed to attach to its complaint "any exhibits which denote the writings which allegedly confirmed the agreement" in question, and argues that it cannot respond to Caldor's complaint until it has examined "any/all writings which confirmed the oral agreement." Complaint, at 2. Accordingly, pursuant to Fed.R.Civ.P. 12(e), Laser asks this court to require that Caldor comply with its demand to attach "all writings as exhibits to said complaint which denote any and all agreements between plaintiff and defendant." Id., at 2.

DISCUSSION

This motion for a **more definite statement** is without merit. There is no apparent defect in plaintiff Caldor's complaint. Fed.R.Civ.P. 8(a) requires of a claimant no more than "a short and plain statement of the claim," while Rule 8(e) stipulates

that each pleading "shall be simple, concise, and direct." Laser is properly informed of Caldor's breach of contract and other claims against it, and it is inappropriate to demand further evidentiary detail at this time. Since the notice-pleading requirements of the Federal Rules are deliberately lenient, motions for a **more definite statement** are not favored. See, e.g., Famolare, Inc. v. Edison Bros. Stores, Inc., 525 F.Supp. 940, 949 (E.D.Cal.1981). Under this system, the production of factual detail is not necessary at the pleadings stage of litigation, but is rather put off until formal discovery. Frederick v. Koziol, 727 F.Supp. 1019, 1020-21 (E.D.Va.1990).

**Rule 12(e)** permits a defendant to move for a **more definite statement**, but it "will be granted only when the complaint is so vague and ambiguous that the defendant cannot frame a responsive pleading." Id. at 1021 (citations omitted); Wheeler v. U.S. Postal Service, 120 F.R.D. 487, 488 (M.D.Pa.1987). See generally 2A Moore's Federal Practice, para. 12.18 (1993 ed.). A motion for a **more definite statement** under Fed.R.Civ.P. 12(e)

is intended to address unintelligibility, rather than a lack of detail.... If the opposing party is fairly informed of the nature of the claim by the complaint, a motion for a **more definite statement** should not be granted. Such motions ... should not be used as a substitute for discovery....

In re Norton Heights Enterprises Corp., 96 B.R. 11, 15 (Bkrtcy.D.Conn.1989) (citations omitted).

The complaint in this case is thus neither ambiguous nor unintelligible. On the contrary, it clearly and succinctly alleges this court's jurisdiction, identifies the relevant parties, and lays out both a pattern alleged fact and the legal claims against the defendant resulting therefrom. It cannot in any way be said to be defective within the meaning of the Federal Rules.

*2 The documentation that Laser seeks is inappropriate at this stage. It seeks the production of an alleged written contract, but such evidentiary production is more properly reserved for formal discovery. "The information sought by the defendants appears to be of an evidentiary nature, but it is not the function of a motion for a **more definite statement** to discover evidence.... [T]he plaintiff has given the defendants sufficient notice of the nature of his claim to enable them to prepare a responsive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
1993 WL 298971 (D.Conn.)
**(Cite as: 1993 WL 298971 (D.Conn.))**

pleading." _Nixa v. Hayes,_ 55 F.R.D. 40, 41
(E.D.Wis.1972) (citation omitted).

The court concludes, after careful review of the
complaint, that it is not so vague or ambiguous that
the defendant cannot respond.   The complaint gives
the defendant fair notice of the claims made against
them.   Laser will have ample opportunity to obtain
additional information from the plaintiff through
discovery.

### CONCLUSION
For the reasons stated above, defendant Laser's
Motion for a **More Definite Statement** (filed May
17, 1993) is DENIED.

It is so ordered.

1993 WL 298971 (D.Conn.)

**Motions, Pleadings and Filings (Back to top)**

• 3:93CV00695_____(Docket)
(Apr. 01, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.