UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JP MORGAN CHASE BANK, | ) | |
| | ) | |
| Plaintiff | ) | |
| (Defendant-in-Counterclaim), | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:02 CV 02266 (AVC) |
| | ) | |
| RIDGEFIELD PROPERTIES, LLC, and | ) | |
| STOP & SHOP SUPERMARKET CO. | ) | |
| (sic), | ) | |
| | ) | |
| Defendants | ) | |
| (Plaintiffs-in-Counterclaim). | ) | |

**THE STOP & SHOP SUPERMARKET COMPANY LLC'S
OPPOSITION TO JP MORGAN CHASE BANK'S
MOTION TO DISMISS SECOND COUNTERCLAIM**

JP Morgan Chase Bank's ("Chase") motion to dismiss mischaracterizes The Stop & Shop

Supermarket Company LLC's ("Stop & Shop") Connecticut Unfair Trade Practices Act

("CUTPA") claim against Chase. As Chase's own statements to this Court in this litigation

make clear, Stop & Shop's CUTPA claim is premised entirely on Chase's tortious and deliberate

actions taken in the context of Chase's *banking business*. Chase is bound by its representations

to this Court; hence, Chase's motion has no support.

Chase's status as a lessee is wholly incidental to Stop & Shop's CUTPA claim. Indeed,

Stop & Shop is not (and never was) Chase's landlord. Notwithstanding oral and written

assurances to the contrary, Chase refused to vacate its leasehold at the expiration of its lease

term. Chase's wrongful conduct was motivated solely by Chase's desire to avoid an alleged loss

of banking customers and interruption of its banking business. Chase's improper conduct caused

Stop & Shop to incur damages. Accordingly, Stop & Shop has properly plead a CUTPA violation. The Court should therefore deny Chase's motion to dismiss.

**Factual Background**

On or about December 3, 1992, the predecessors-in-interest to Chase entered into a lease with co-Defendant Ridgefield Properties, LLC ("Ridgefield") (the "Chase Lease") for retail space at the Copps Hill Plaza, Ridgefield, Connecticut (the "Premises"). See Stop & Shop's Counterclaims (the "Counterclaims") at ¶ 4. Chase operated a branch bank location. Id. Pursuant to the terms of the Chase Lease, Chase's tenancy expired on December 31, 2002. Id. at ¶ 5. The Chase Lease did not provide any option for renewal by Chase. Id.

On or about October 26, 2001, Stop & Shop, as tenant, and Ridgefield, as landlord, entered into an Amended and Restatement of Lease regarding Stop & Shop's leasehold at the Premises (the "Stop & Shop Lease"). See Counterclaims at ¶ 7. The Stop & Shop Lease contemplated an expansion of Stop & Shop's retail space and a reconfiguration of the Premises (the "Expansion Project"). Id. at ¶ 9.

In April 2001, Chase informed Ridgefield that it would relocate to retail space off the Premises. See Counterclaims at ¶ 15. Ridgefield offered to pay Chase's new landlord $50,000 as an inducement if Chase vacated the Premises by February 15, 2002. Id. Chase did not relocate. Id. On several occasions thereafter, Ridgefield notified Chase that the Chase Lease required Chase to vacate the Premises on or before December 31, 2002. Id. at ¶¶ 14-19. Stop & Shop understood that the Chase Lease expired on December 31, 2002. Id. at ¶ 13. Based upon Chase's anticipated vacancy of the Premises on or before December 31, 2002, Stop & Shop expected to commence its expansion no later than April 15, 2003. Id.

Chase knew and fully understood that completion of the Expansion Project was contingent upon Chase's timely departure from the Premises, and that holding over at the expiration of the lease term would delay Stop & Shop's expansion. See Counterclaims at ¶ 12; see also Memorandum of Law in Support of Chase's Motion to Dismiss (the "Memo.") at 4. Despite this knowledge, Chase did not vacate the Premises until May 23, 2003, almost five months after the expiration of the Chase Lease. See Memo. at 4. Chase's failure to timely vacate the Premises had a domino effect which also disrupted the reconfiguration of the Premises, thus further delaying Stop & Shop's expansion and causing Stop & Shop damage. Id.

Chase had a duty pursuant to the Chase Lease to vacate the Premises on December 31, 2002, and failed to do so in breach of the Lease. See Memo. at 4. Chase did not vacate timely the Premises because, Chase alleges, if it had, it "would have incurred substantial harm, including, but not limited to, the loss of its customer base and the cost to re-enter the market as a new market participant." See Chase's Complaint dated October 20, 2004 (without exhibits) (the "Complaint"), appended hereto as Exhibit A at ¶ 50. Chase has also alleged that had it "been forced to surrender [its leasehold] at the expiration of the term of the Lease, it would have inevitably lost numerous accounts." Id. at ¶ 53. Chase contends that "[t]he potential harm to Chase far exceeded any potential harm to Stop & Shop." Id. at ¶ 56.

## Argument

### The Court Should Deny
### Chase's Motion To Dismiss

In deciding a motion to dismiss, "the Court must accept as true all factual allegations of the complaint, and must construe the complaint in favor of the complaining party." Construction & General Laborers' Local Union No. 230 v. City of Hartford, 153 F. Supp. 2d 156, 159 (D. Conn. 2001) (quoting Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997));

see also Travelers Indem. Co. of Connecticut v. Presbyterian Healthcare Resources, 313 F. Supp.

2d 648, 650-51 (N.D. Tex. 2004) (motion under Rule 12(b)(6) is applicable to any pleading,

whether it be the plaintiff's original complaint or a defendant's counterclaim).  A complaint

"should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitled him to relief."

Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Chase's motion to dismiss should be denied for at least three reasons.  First, Chase's

tortious conduct arises exclusively out of Chase's "primary business," i.e., its banking business.

Chase's knowing disregard of its contractual obligations and its reneging on prior assurances to

vacate the Premises directly relate to Chase's primary business operations.  Indeed, Chase has

conceded that the reason it held over at the end of its lease term was to avoid an interruption of

its banking business and loss of banking customers.  See Complaint at ¶¶ 50, 53.  Second,

Connecticut Courts have found that even tortious conduct which occurs outside the ordinary

course of a party's primary business may constitute a CUTPA violation provided it takes place in

a "business context."  Accordingly, Stop & Shop's CUTPA claim survives even if this Court

deems Chase's tortious conduct to arise out of operations incidental to its primary business.

Last, despite Chase's contentions to the contrary, there is little doubt that Chase *is* in the leasing

business.  Chase's lease negotiations were handled by Chase-created corporate divisions such as

Chase Manhattan Bank Corporate Properties Group, Chase Retail Properties Group and Chase

Commercial Real Estate LLC.  See documents attached hereto as Exhibit B.[1]

Chase cannot have it both ways.  On the one hand, Chase claims it did not vacate the

Premises out of concern for its banking customers.  See Complaint at ¶¶ 50, 53.  On the other

hand, Chase now claims that its admitted breach of its lease had nothing to do with its banking

---

[1]     These documents are attached to Chase's Complaint as Exhibits B, D, E and F, respectively.

business.  See, e.g., Memo. at 5.  Stop & Shop has properly plead a CUTPA claim against Chase.

Consequently, the Court should deny Chase's motion to dismiss.

**A.    Chase's Tortious Conduct Arises Out Of Chase's
         Banking Business**

"To state a claim under CUTPA, the plaintiff must allege that the actions of the defendant

were performed in the conduct of trade or commerce."  Muniz v. Kravis, 59 Conn. App. 704, 711

(2000).  Stop & Shop has more than met this burden.  In its Counterclaims, Stop & Shop alleges

the following:

> In October 2002, Ridgefield informed Chase that it expected Chase
> to honor the terms of the Chase Lease and vacate the Premises on
> or before December 31, 2002.  Ridgefield specifically informed
> Chase that Chase's holding over at the expiration of the Lease term
> would jeopardize the timely completion of the Expansion Project
> and delay Stop & Shop's planned expansion.
>
> \*    \*    \*
>
> On December 19, 2002, Chase informed Ridgefield that it did not
> intend on vacating the Premises by December 31, 2002.  Chase
> remained on the Premises after December 31, 2002.
>
> \*    \*    \*
>
> Chase knew and fully understood that completion of the Expansion
> Project was contingent upon Chase's vacating the Premises.  Chase
> also knew and fully understood that Stop & Shop could not begin
> expansion of its store until Chase vacated the Premises.
>
> \*    \*    \*
>
> Chase intentionally and improperly held over at the end of its lease
> term to interfere with the Expansion Project.
>
> \*    \*    \*
>
> Chase's holding over was improperly motivated by personal
> benefit and to pressure Ridgefield into acquiescing to a renewed
> tenancy on terms favorable to Chase.

See Counterclaims at ¶¶ 23, 26, 39, 41-42.  Stop & Shop does not dispute that Chase's "primary business" is banking.  However, Chase's contention that its deliberate holdover at the expiration of its lease term was "merely incidental" to its banking business is meritless.

As alleged in its Complaint, Chase's refusal to vacate the Premises at the end of its lease term was a calculated business decision motivated directly by Chase's desire to avoid a disruption of its banking business:

> If Chase had been forced to surrender the Demised Premises at the expiration of the term of the Lease, it would have inevitably lost numerous accounts.  Chase would have been forced to enter the market as a new market participant at great additional cost when relocated [sic] the Ridgefield Branch.
>
> *   *   *
>
> Should Chase have been forced to surrender the Demised Premises prior to relocation, it would have incurred substantial harm, including, but not limited to, the loss of its customer base and the cost to re-enter the market as a new market participant.

See Complaint at ¶¶ 50, 53.  Chase concedes that Ridgefield offered Chase alternate retail space on the Premises prior to the expiration of the Chase Lease.  Id. at ¶ 32.  Chase balked, however, based on Ridgefield's alleged failure to provide Chase with a customer drive-up window – "a virtual lifeline to any retail banking establishment."  Id. at ¶ 11.  Chase thereafter refused to vacate the Premises until its new location (outfitted with a customer drive-up window) was ready.  Id. at ¶¶ 32-33.  Chase also claims that it did not pursue opportunities to relocate the Ridgefield branch elsewhere based upon Ridgefield's alleged assurances that Chase's "ability to serve its customers would continue unfettered and uninterrupted."  Id. at ¶ 18.  Chase's concern over losing accounts and its desire to serve its customers uninterrupted are hardly "incidental" to its banking business.  See Cornerstone Realty, Inc. v. Dresser Rand Co., 993 F. Supp. 107, 113 (D. Conn. 1998).

Stop & Shop is not Chase's landlord. Accordingly, the cases cited by Chase regarding CUTPA claims brought in the lessor-lessee context are wholly inapplicable to this case. <u>See, e.g.,</u> <u>Sealy Connecticut, Inc. v. Litton Indus., Inc.,</u> 989 F. Supp. 120 (D. Conn. 1997) (finding that lessee's contamination of rental property was incidental to its manufacturing business). In contrast, Stop & Shop's CUTPA claim is premised entirely on Chase's calculated business decision to remain on the Premises at the end of its lease term in furtherance of Chase's banking business. Stop & Shop has alleged, with requisite particularity, that Chase acted improperly in serving its own needs in the course of Chase's "trade or commerce," i.e., conducting its banking business, in knowing disregard of Stop & Shop's planned Expansion Project. <u>See</u> <u>Service Road Corp. v. Quinn,</u> 241 Conn. 630, 637 (1997) ("CUTPA is remedial in character ... and must be liberally construed in favor of those whom the legislature intended to benefit."). Accordingly, the Court should deny Chase's motion to dismiss Stop & Shop's CUTPA claim.

**B.    Stop & Shop Has Stated a CUTPA Claim Because Chase's Misconduct Arises In a "Business Context"**

Alternatively, even if the Court finds that, despite Chase's own representations to the contrary, Chase's misconduct did not arise out of its banking business, Stop & Shop has still properly plead a CUTPA violation. "The Connecticut Supreme Court has not yet interpreted the 'trade or commerce' provision of CUTPA, and Superior Court cases addressing the issue have reached two diverging views in determining the definition of 'trade' or 'commerce.'" <u>Nation v. Allstate Ins. Co.,</u> 2005 WL 531332 (Conn. Super. Ct. January 31, 2005) at *3 (internal citation omitted) (appended hereto as <u>Exhibit C</u>). In its motion to dismiss, Chase has provided the Court with but one interpretation, i.e., that an actionable CUTPA claim must arise out of a defendant's "primary business." <u>See</u> Memo. at 6. However, Connecticut Courts have also found that "a transaction need not take place in the defendant's ordinary course of business so long as it takes

place in a business context." See Nation at *3 (and cases collected). The so-called business context standard "essentially holds that an isolated transaction that occurs outside of the ordinary course of the defendant's primary business may constitute a CUTPA violation provided it takes place in a business context." Duncan v. PEH I, LP, 2003 WL 1962789 (Conn. Super. Ct. April 1, 2003) at *3 (appended hereto as Exhibit D).

Chase's misconduct, as alleged by Stop & Shop, clearly took place in a business context. Chase is in the banking business. Chase has conceded that it held over at the expiration of its lease term because it did not want to sustain an interruption of its banking business. See Complaint at ¶¶ 50, 53. Chase has also conceded that it refused to vacate the Premises after the expiration of its lease until its new location with a customer drive-up window was ready. Id. at ¶¶ 32-33. A customer drive-up window, claims Chase, is "vital" to a banking branch's success. Id. at ¶ 25. Moreover, as Stop & Shop has alleged, Chase's holdover was intended to pressure Ridgefield into "acquiescing to a renewed tenancy on terms favorable to Chase." Id. at ¶ 41. This conduct amounts to commercial extortion, which is a CUTPA violation. See, e.g., City of Bridgeport v. Aerialscope, Inc., 122 F. Supp. 2d 275, 278 (D. Conn. 2000) (recognizing CUTPA violation where, as here, there are "aggravating circumstances" surrounding defendant's breach of contract). Accordingly, even under the business context standard, Stop & Shop has plead a cognizable CUTPA claim.

### C.    Chase Is In The Leasing Business

Chase's contention that it is not in the leasing business is disingenuous at best. See, e.g., Memo. at 5 ("Neither has Stop & Shop alleged, *because it cannot*, that Chase is in the business of leasing properties.") (emphasis added). Chase's negotiations with Ridgefield regarding Chase's tenancy at the Premises were handled, not by the bank branch manager, but rather, by

representatives of "The Chase Manhattan Bank Corporate Properties Group." See Exh. B. While leasing properties may not be Chase's "primary" business, it is clearly an integral component of Chase's banking business. Without retail locations on which to operate, Chase has no banking business. Consequently, to the extent Chase seeks to snuff out Stop & Shop's properly plead CUTPA claim, on the alleged basis that Chase does not engage in the "leasing" business, such efforts should be rejected. Accordingly, the Court should deny Chase's motion to dismiss.

### Conclusion

For the reasons set forth herein, the Stop & Shop Supermarket Company LLC respectfully requests that the Court deny Chase's Motion to Dismiss Second Counterclaim.

May 20, 2005

Respectfully submitted,

THE STOP & SHOP SUPERMARKET
COMPANY LLC,

By its attorneys

John C. La Liberte
Anthony L. DeProspo, Jr.
SHERIN AND LODGEN LLP
101 Federal Street
Boston, Massachusetts 02110
(617) 646-2000

*Of Cousnel:*
Lewis K. Wise
Rogin, Nassau, Caplan, Lassman & Hirtle, LLC
CityPlace I, 22nd Floor
185 Asylum Street
Hartford, CT 06103-3460
(860) 278-7480

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by ~~hand~~/mail.

Date: May 20, 2005