UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, | : | CIVIL ACTION NO.: |
| Plaintiff, | : | |
| V. | : | |
| STOP & SHOP SUPERMARKET CO., | : | |
| Defendant. | : | OCTOBER 20, 2004 |

## COMPLAINT

The plaintiff, JPMorgan Chase Bank, by and through its attorneys, allege for its Complaint against the defendant, Stop & Shop Supermarket Co., as follows:

## PARTIES

1. The plaintiff, JPMorgan Chase Bank, ("Chase"), is a New York banking corporation with its principal place of business in New York, New York. Chase operates a retail bank branch located at Copps Hill Plaza in Ridgefield, Connecticut (the "Ridgefield Branch").

2. The defendant, Stop & Shop Supermarket Co. ("Stop & Shop"), is a corporation with its principal place of business at 1385 Hancock Street, Quincy, Massachusetts. Stop & Shop operated, and continues to operate, a supermarket at Copps Hill Plaza in Ridgefield, Connecticut.

3. Ridgefield Properties LLC ("Ridgefield Properties"), owns and operates a shopping plaza commonly known as the Copps Hill Plaza in Ridgefield, Connecticut (the "Plaza").

4. Upon information and belief, Samuels & Associates Management, LLC ("Samuels") acted as agent for Ridgefield Properties at all times relevant herein.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that diversity of citizenship is present, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

6.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 2201 and 2202, as Chase seeks a declaratory judgment as to the rights and obligations of the parties, and further relief based on that judgment.

7.  This Court has personal jurisdiction over Stop & Shop in that the claims set forth herein arise from Stop & Shop's conducting business in this State.

8.  Venue is proper pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Stop & Shop is subject to the personal jurisdiction of this Court.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9.  Chase's claims arise out of Stop & Shop's demand for damages it purports to have incurred as a result of Chase's occupancy of a leased premises located at the Plaza, which occupancy is a direct result of Ridgefield Properties and Samuels' unscrupulous and unethical business practices and their breach of numerous covenants expressed and implied in a lease agreement between Chase and Ridgefield Properties. Stop & Shop's demand for damages has created an inequitable situation warranting this Court's intervention and the award of equitable and legal remedies.

## The Lease

10. The legal relationship between Chase and Ridgefield Properties and Samuels' is governed by a lease executed over ten years ago. Chase's predecessor in interest, Chase Manhattan Bank of Connecticut, N.A., and Ridgefield Properties' predecessor in interest, Copps Hill Plaza Shopping Associates, entered into the lease agreement on December 3, 1992 (the "Lease") for the use and occupancy of the demised premises at the Plaza, located at Copps Hill Road and Route 35 in Ridgefield, Connecticut ("Demised Premises"). A copy of the Lease is incorporated herein and is attached as Exhibit A.

11. Since that time, Chase has used the Demised Premises to operate its Ridgefield Branch. The Ridgefield Branch utilizes a drive-through banking window -- a virtual lifeline to any retail banking establishment.

12. The Lease authorizes Chase to use and occupy of the Demised Premises until December 31, 2002. The Lease also provides that Chase may hold over and that any such holding over may be treated as a hold-over tenancy or a tenancy at sufferance, the rent for which would be 1.5 times Chase's present Fixed Annual Rent. See Lease at §§ 18.01-.02.

13. The Lease also contains a Force Majeure clause which provides that "[e]ach party shall be excused for the period of any delay in the performance of any obligation hereunder when prevented from doing so by a cause or causes beyond such party's control. . . ." Lease at Art. 34.

14. The Lease further provides Chase with the right of Peaceful Possession of the Demised Premises, (see Lease at Art. 38), the implied provisions of a covenant of good faith and fair dealing, and the right to quiet enjoyment of the Demised Premises.

### Negotiations For New Space

15. On or about December 1999, in anticipation of the expiration of the Lease's term, Chase, Ridgefield Properties, and Samuels commenced discussing Chase's tenancy post December 31, 2002. Those discussions were commenced by Mr. Joel Sklar of Samuels who informed Chase that the Copps Hill Plaza would be reconfigured. At that time, Chase informed Ridgefield Properties and Samuels that it would like to remain in the Plaza. See, e.g., correspondence from Mr. Brendan M. O'Riordan to Mr. Joel Sklarz, dated December 3, 1999, a copy of which is incorporated herein and attached as Exhibit B.

16. Prior to December of 1999, Chase was unaware that Ridgefield Properties and Samuels planned to reconfigure the Plaza. Chase similarly was unaware that the reconfiguration included the demolition of strip store retail space located adjacent to the Demised Premises and the subsequent construction in that space of an Eckerd's Drug Store ("Eckerd's"). Chase was unaware that the reconfiguration included the complete demolition of the Demised Premises for additional parking.

17. Chase was also unaware that the reconfiguration of the Plaza included plans by Stop & Shop to reconstruct the supermarket it operated at the Plaza, including an anticipated expansion of the store from approximately 30,000 square feet to approximately 60,000 square feet.

18. The new lease discussions continued through the year 2000 and into 2001. Ridgefield Properties and Samuels continued to lead Chase to believe that space would be available in the Plaza and that its ability to serve its customers would continue unfettered and uninterrupted. Chase relied on Ridgefield Properties and Samuels' representations in deciding not to pursue opportunities to relocate its Ridgefield Branch elsewhere.

19. On February 22, 2001, however, Ridgefield Properties and Samuels definitively informed Chase that, if it remained in the Plaza, it would not be allowed to have a drive-through window to service its customers. Ridgefield Properties and Samuels stated that the Plaza was zoned for only one drive-through and, despite the fact that Chase had operated the one allotted drive-through at the Plaza for over eight years, Eckerd's was to receive the benefit of operating the allotted drive-through going forward.

20. Having relied to its detriment on Ridgefield Properties and Samuels' representations for over nine months, Chase was left with less than two years to find and fit a suitable alternative location in the small town of Ridgefield.

21. For approximately one year, Chase explored opportunities to relocate the Ridgefield Branch elsewhere.

22. In March of 2002, however, Ridgefield Properties and Samuels submitted to Chase a sketch of new building space for Chase's use in the Plaza. At that time, Ridgefield Properties and Samuels also represented that, if Chase would remain in the Plaza and take the new space, they would apply to the Ridgefield Zoning Board for the approval of an additional drive-through window for Chase.

23. Based on these representations by Ridgefield Properties and Samuels, Chase ceased pursing locations elsewhere and entered into negotiations exclusively with Ridgefield Properties and Samuels. Those negotiations ultimately culminated in Chase's signing of a Letter of Intent in June 2002, and the subsequent creation of draft leases. A copy of a draft lease is incorporated herein and attached as Exhibit C.

24. In September of 2002, with just four months remaining on the term of the Lease, Ridgefield Properties and Samuels once again reversed their position with regard to the drive-

through for the proposed space for Chase. Ridgefield Properties and Samuels stated that they would no longer provide good faith efforts to obtain zoning approval (including any necessary appeals) for the requisite drive-through window.

25. As Ridgefield Properties and Samuels were aware, a drive-through window was and is vital to the success of the Ridgefield Branch. Chase had consistently made it known to Ridgefield Properties and Samuels that a drive-through window was a prerequisite to its continued tenancy at the Plaza. See, e.g., correspondence from Mr. O'Riordan to Mr. Sklar, dated February 3, 2000; Correspondence from Mr. O'Riordan to Mr. Sklar, dated March 22, 2000; Facsimile from Mr. O'Riordan to Mr. Sklar, dated January 31, 2001. Copies of these correspondence are incorporated herein and attached as Exhibits D, E, and F, respectively.

26. Ridgefield Properties and Samuels knew that Chase needed a drive-through for its location, used that fact to induce Chase to enter into an agreement, and reversed their position with respect to the drive-through once Ridgefield Properties and Samuels perceived that it would be too late for Chase to secure an alternative location.

27. Upon securing a new location for its retail banking branch, Chase worked expeditiously to fit that location, which included necessary environmental remediation. Although the new location was not expected to be ready for operation until July 1, 2003, through Chase's diligent efforts, it vacated the Demised Premises earlier than anticipated on May 26, 2003.

## Reconfiguration of the Plaza

28. Beginning in November 2001, Ridgefield Properties and Samuels began their reconfiguration of the Plaza. This reconfiguration included the demolition of existing structures and site work that resulted in the excavation of the area surrounding the Demised Premises.

29. As a direct result of the demolition and construction work, Chase experienced a substantial disruption in its use of the Demised Premises, including, but not limited to:

    a. loss of water for periods exceeding one week;

    b. intermittent loss of use of plumbing and other utilities; and

    c. intermittent loss of use of the drive-through.

30. Furthermore, the area surrounding the Demised Premises was so destructed that customers thought the bank was closed. As a result, the Ridgefield Branch's comparable sales, which had been trending up, fell dramatically through the first half of 2002. Chase was ultimately forced to post large "OPEN FOR BUSINESS" signs to alert even its existing customers that the Ridgefield Branch was neither closed nor closing.

### Government Intervention

31. Chase, a victim of Ridgefield Properties and Samuels' unscrupulous tactics, was prohibited from performing its obligation to surrender the Demised Premises at the expiration of the Lease.

32. The alternative site ultimately proposed by Ridgefield Properties and Samuels at the Plaza could not have a drive-through due to the zoning regulations of the Town of Ridgefield.

33. Chase's new location could not be ready for Chase until after the expiration of the Lease as a result of environmental regulations and requisite remediation.

34. These governmental regulations and controls necessarily prevented Chase from performing its obligation to surrender the Demised Premises as of December 31, 2002.

35. An actual controversy existed as to Chase's rights and duties under the Lease and its equitable right to remain at the Demised Premises until its new premises were completed. Accordingly, on December 20, 2002, Chase filed a declaratory judgment action against

Ridgefield Properties and Samuels entitled, <u>JPMorgan Chase Bank v. Ridgefield Properties LLC, et al</u>, Civil Action No.: 3:02 CV 2266 (AWT), pending before the United States District Court for the District of Connecticut (the "Action"). The Action was commenced for purposes of establishing the rights of the parties, including, more specifically, the resulting economic damage that Chase would have incurred and the damage to Chase's customers and relationships with those customers, were Chase forced to surrender the Demised Premises prior to the expiration of the Lease.

### Demands by Stop & Shop

36. After the commencement of the Action, Chase received a "demand for damages" from Stop & Shop on January 22, 2004. <u>See</u> Correspondence from Frank J. Bailey, Esq. to the plaintiff, JPMorgan Chase Bank, dated January 22, 2004, a copy of which is incorporated herein and attached as Exhibit G.

37. Stop & Shop claims to have been injured as a result of Chase's hold-over occupancy of the Demised Premises, alleging that said hold-over purportedly delayed the renovation and expansion of its supermarket located at the Plaza. More recently, Stop & Shop further alleged that Chase intentionally interfered with its business expectancies.

38. Any delay experienced by Stop & Shop in connection with its renovation and expansion project did not result from Chase's hold-over at the Demised Premises. Stop & Shop did not obtain the requisite approvals and permits in order to commence construction until well after Chase vacated the Demised Premises on May 23, 2003.

39. On or about October 29, 2003, Stop & Shop submitted a development application to the Town of Ridgefield for purposes of obtaining the permit required for the planned renovation, five (5) months after Chase vacated the Demised Premises. <u>See</u> Development Application, dated

October 29, 2003 ("Development Application"), a copy of which is incorporated herein and attached as Exhibit H.

40. On or about January 15, 2004, Stop & Shop applied for the requisite demolition permit in order to commence the demolition that was needed in connection with the renovation project. See Application for Demolition Permit, dated January 15, 2004 ("Demolition Permit"), a copy of which is incorporated herein and attached as Exhibit I.

41. Stop & Shop claims to have incurred in excess of $1 million in damages as a result of a purported delay in construction caused by Chase's occupancy of the Demised Premises. Stop & Shop's allegations and demands have frustrated the possibility of otherwise reaching a resolution of the Action as complete relief cannot be afforded because of Stop & Shop's claims.

42. The allegations asserted by Stop & Shop and related demands for payment of damages have created a reasonable apprehension on the part of Chase that it will be sued in connection with these allegations. As a result, an actual controversy exists between Chase and Stop & Shop regarding their respective rights and Chase's right to remain at the Demised Premises until its new location was completed.

### FIRST CLAIM FOR RELIEF
(Declaratory Judgment - Force Majeure)

43. Chase incorporates Paragraphs 1 through 42 of this Second Amended Complaint as if fully set forth herein.

44. Chase seeks a declaratory judgment against Stop & Shop, pursuant to 28 U.S.C. § 2201, as to Chase's rights and duties and that its obligation to surrender the Demised Premises was excused pursuant to force majeure, as contemplated by Article 34 of the Lease.

45. Chase was delayed in performing its obligation to surrender because of Ridgefield Properties and Samuels' conduct, government zoning and environmental regulations and controls, and other factor's beyond Chase's control.

## SECOND CLAIM FOR RELIEF
(Declaratory Judgment - Equitable Estoppel)

46. Chase incorporates Paragraphs 1 through 45 of this Second Amended Complaint as if fully set forth herein.

47. Chase seeks a declaratory judgment against Stop & Shop, pursuant to 28 U.S.C. § 2201, that Ridgefield Properties was equitably estopped from evicting Chase from the Demised Premises prior to Chase's relocation of the Ridgefield Branch.

48. Ridgefield Properties and Samuels represented to Chase that it would have a drive-through at its new location in the Plaza. That representation was calculated and intended to induce Chase to cease negotiations with other parties and execute a Letter of Intent to lease space in the Plaza.

49. Chase relied to its detriment on Ridgefield Properties and Samuels' representations.

50. Should Chase have been forced to surrender the Demised Premises prior to relocation, it would have incurred substantial harm, including, but not limited to, the loss of its customer base and the cost to re-enter the market as a new market participant.

## THIRD CLAIM FOR RELIEF
(Declaratory Judgment - Equitable Entitlement)

51. Chase incorporates Paragraphs 1 through 50 of this Second Amended Complaint as if fully set forth herein.

52. Chase seeks a declaratory judgment against Stop & Shop, pursuant to 28 U.S.C. § 2201, that Chase was equitably entitled to remain in the Demised Premises until it could relocate the Ridgefield Branch.

53. If Chase had been forced to surrender the Demised Premises at the expiration of the term of the Lease, it would have inevitably lost numerous accounts. Chase would have been forced to enter the market as a new market participant at great additional cost when relocated the Ridgefield Branch.

54. By contrast, as a result of Chase's continued occupancy of the Demised Premises, Ridgefield Properties and Samuels only temporarily lost a small number of parking spaces, as it was their intent to demolish the Demised Premises for that purpose.

55. Chase' continued occupancy of the Demised Premises did not delay or otherwise impact Stop & Shop's renovation and expansion of its supermarket because Stop & Shop did not begin to apply for the appropriate approvals and permits required in connection with the renovation until five (5) months after Chase vacated the Demised Premises.

56. The potential harm to Chase far exceeded any potential harm to Stop & Shop.

## TRIAL BY JURY

The plaintiff, JPMorgan Chase Bank, demands trial by jury on all issues that are triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff, JPMorgan Chase Bank, requests relief as follows:

1. Declaratory judgment that Chase's obligation to surrender the Demise Premises is excused pursuant to force majeure was contemplated by Article 34 of the Lease;

2. Declaratory judgment that Chase was entitled to remain at the Demised Premises until such time as it could relocate its Ridgefield Branch;

3. Declaratory judgment that Chase's conduct in remaining at the Demised Premises did not cause any delay in the construction and renovation of Stop & Shop's supermarket located in the Plaza;

4. Costs of this action; and

5. Such additional and further relief as the Court deems just and proper.

Dated: October 20, 2004
Hartford, Connecticut

THE PLAINTIFF,
JPMORGAN CHASE BANK,

By: _____
Timothy S. Fisher (CT 05370)
Jason C. Welch (CT 23418)
McCARTER & ENGLISH LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103
Tel: 860.275.6700
Fax: 860.724.3397

HARTFORD: 625302.01